UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10073-RWZ

CHRISTINE M. CALOIA,

v.

PUTNAM INVESTMENTS, LLC,
and CHERYL AHL,

MEMORANDUM OF DECISION

August 21, 2012

Plaintiff, Christine M. Caloia, claims against Putnam Investments for retaliatory discrimination under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, and against her supervisor Cheryl Ahl ("Ahl") for interference with an advantageous business relationship.[1] Currently before me are defendants' motions for summary judgment (Docket # 17) and to strike certain documents and statements from plaintiff's opposition that had not been previously authenticated (Docket # 30).

**I. Background**

Plaintiff worked for Putnam Investments for 26 years performing various functions. Most recently, she served as a Senior Tax Project Leader in the firm's Operational Compliance Department ("OCD"). Plaintiff worked from home until the option to do so was eliminated in 2008. Defendant Cheryl Ahl was plaintiff's immediate

---

[1] Although the complaint was originally in four counts, plaintiff has agreed to voluntarily dismiss Counts II and III.

supervisor for the relevant time period. In January 2008 plaintiff began to experience debilitating neck pain which eventually led her to undergo spinal fusion surgery. Prior to the surgery she filed and was approved for disability pay and FMLA leave from early January to mid-February. In mid-March she underwent surgery and, through a combination of additional FMLA and non-FMLA approved leave returned to work in May 2008.

Upon her return, the complaint alleges, plaintiff began to receive severe and unwarranted scrutiny from Ahl, was not reassigned her prior job responsibilities, was treated differently from similarly situated employees, and ultimately, in November 2008 was terminated for exercising her leave rights under the FMLA, although it was couched by Putnam as a termination for "insubordination."

## II. Standard

Summary judgment will be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation marks omitted). "[A]t the summary judgment stage, [ ] all reasonable inferences must be drawn for the non-movant." In re Marrama, 445 F.3d 518, 522 (1st Cir. 2006).

## III. Analysis

### A. Retaliation Claim

Where there is no direct evidence of discrimination, the plaintiff must first establish a prima facie case of retaliation by demonstrating that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection existed between the two. Hodges v. General Dynamics Corp., 144 F.3d 151, 160, 161 (1st Cir. 1998). Once the plaintiff makes such a showing, the burden shifts to the employer to articulate a non-discriminatory justification for the termination. Id. at 160-161. If the employer articulates such a reason, the burden shifts back to the plaintiff to demonstrate that the employer's reason was a mere pretext for retaliation. Id. Defendants contend that plaintiff has not met her burden of establishing a prima facie case, and even if she has, that she cannot establish pretext.

### 1. Prima Facie Case

Here, it is undisputed that plaintiff requested and received FMLA leave and was terminated within six months of her return. A causal connection can be shown through evidence of "discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action." Che v. Massachusetts Bay Transp. Authority, 342 F.3d 31, 38 (1st Cir. 2003). Plaintiff alleges that defendants treated her differently by, inter alia, engaging in a "pattern of antagonism" during the time between the taking of leave and her termination.

Plaintiff alleges that Ahl was angry with her for taking leave at an extremely busy time for the OCD department. During this time the group was responsible for issuing shareholder tax forms and had the additional responsibility of translating these forms

3

into a format that could be used by a new upgraded system still unfamiliar to many of the employees.

Upon her return from FMLA leave, plaintiff indicates that Ahl took detailed notes on her performance and subjected her to intense scrutiny above and beyond that of the other employees. Ahl's notes reflect such scrutiny, stating, on one occasion "other things Christine did/did not do' today" and on another "no [sic] sure what she did." Exs. 43, 49 to Plaintiff's F.R.C.P. 56.1 Statement of Undisputed Facts (herein, "P's 56.1 Statement").  One of Ahl's notes reflects disapproval that an update provided by plaintiff to Ahl that was supposed to begin at 4:00 pm did not start until "4:02 pm." Ex. 22 to P's 56.1 Statement.  In addition, several of Ahl's other notes appear to use unprofessional language directed at plaintiff such as: "been told [plaintiff] has been talking trash ..." and plaintiff was "mouthing off on floor about templates...". Exs. 45, 49 to P's 56.1 Statement. Plaintiff asserts that overall these notes have a bitter undertone and that a reasonable jury may view them as harboring animus. See Diaz v. Jitel Hotel Mgmt., 762 F. Supp.2d 319, 335 (D. Mass. 2011) ("whether a given remark is 'ambiguous' – whether it connotes discriminatory animus or it does not – is precisely what a jury should resolve, considering all facts in context.")

Plaintiff also points to other specific instances of disparate treatment. For example, defendants eliminated the work from home program which only affected two employees (one living in Texas who left the company shortly after the change and plaintiff); issued a disciplinary warning to plaintiff for tardiness when at least one other employee who was also observed as being tardy did not receive the same warning;

decided not to renew plaintiff's professional licenses while other employees licenses were renewed; and provided another employee with a laptop to facilitate work from home but cited security concerns when plaintiff requested one.

Moreover, although plaintiff does not bring a count for failure to restore her to an equivalent position under the FMLA, she contends that many of her most significant job functions were not restored which is further evidence of defendants' discriminatory animus. Before taking FMLA leave, plaintiff was involved in creating an annual report to the Commonwealth of Massachusetts, performed a quarterly function known as the "bank match process," and had responsibility for preparing monthly filings to the Commonwealth and the Internal Revenue Service. These tasks were reassigned to plaintiff's co-workers and were not restored to plaintiff upon her return from leave. Instead, plaintiff alleges, she was assigned mere "clerical tasks" such as processing account updates, data input, and reviewing clerical reports, which did not have the same level of complexity or responsibility as her prior functions. On several occasions plaintiff communicated to Ahl that she would like to resume her prior functions and noted on her mid-year review that she "look[s] forward to being able to perform tax reporting again;" however, these functions were not returned to her. Ex. 38 to P's 56.1 Statement.

Only a "relatively low threshold showing [is] necessary to establish a prima facie case." Che, 342 F.3d at 39. Here, plaintiff has met her burden.

### 2. Non-Discriminatory Justification

Defendants maintain that plaintiff was fired for "insubordination" because she (1) worked unauthorized overtime; (2) failed to report the overtime she had worked; and (3) worked on a matter not assigned to her, all after being instructed not to do so.

The events comprising plaintiff's alleged insubordination occurred between October 1, 2008, and November 10, 2008.

On October 1, 2008, Ahl sent an email to plaintiff stating:

> [m]y suggestion would be not to spend too much time on [the Salomon/Citi account]. Ultimately this is a business issue. If they want guidance from a tax perspective then you should let them know what they need to do (transfer the accounts, correct the accounts etc.), but it is not your responsibility to solve the problem."

Ex. B, Sub Ex. 15 to Defendants' Motion for Summary Judgment (herein, "Ds' MTD").

Defendants interpret this email as a definitive prohibition from Ahl to plaintiff from working on the Salomon/Citi account.

On November 3, 2008, Ahl noticed that plaintiff had sent her an email one hour after her shift was over. In Ahl's response to this email she stated:

> Christine, The email you sent me on Monday was at 4pm. We do not have any overtime in our budget and when you work past your shift you should be getting paid. Can you please plan to either come in an hour late or leave an hour early one day this week to account for this? ... As you are well aware this time of the year demands are very high and I need to ask everyone to step up and carry a heavier than normal workload.

Ex. A, Sub Ex. 7 to Ds' MTD.

Similarly, defendants interpret this email as a definitive prohibition from Ahl to plaintiff from working overtime.

6

After the Monday, November 3, 2008, email from Ahl, plaintiff worked another five and a half hours of overtime that Wednesday. On Thursday, Ahl emailed plaintiff that "Going forward, you are not to work any hours beyond your scheduled shift (7am-3pm) without pre-approval from me first." [sic] Ex. B, Sub Ex. 11 to Ds' MTD. Ahl copied two members of Putnam's upper management on the email. Plaintiff received the email on Friday morning, became distraught that Ahl had copied her superiors without first having a face-to-face conversation with her, and left work, stating that she needed to leave so she did not "embarrass" herself and to "record as a personal day." Ex. A, Sub Ex. 13 to Ds' MTD.  Later that same day, Ahl and plaintiff spoke on the phone and agreed to have a conversation on Monday regarding the ongoing issues. On Monday afternoon, plaintiff was terminated.

### 3. Pretext

In addition to the treatment described in Section III(A)(1) above, plaintiff contends that the emails upon which defendants rely to establish her insubordination are far from clear admonitions against working on the Salomon/Citi account and working overtime.

First, the October 1, 2008, email is framed as a "suggestion" and instructs plaintiff to continue to give tax support in connection with the Salomon/Citi account. Second, the November 3, 2008, email, while stating that there is no "overtime in our budget," nevertheless urges that "this time of the year demands are very high and I need to ask everyone to step up and carry a heavier than normal workload."

A reasonable jury may determine that making an ambiguous demand of an employee and then later firing that employee for not conforming to such command is merely a pretext for the termination. Such a result is even more likely in light of the other instances of disparate treatment and the fact that Putnam had a policy of progressive discipline, yet plaintiff was fired for working overtime on two occasions within a one-week time span despite her 26 years of employment at the company.

### B. Interference with a Business Relationship Claim

To prevail on a tortious interference claim, a plaintiff must demonstrate: (1) that she had a business relationship; (2) that the defendant knew of this relationship; (3) that the defendant intentionally and maliciously interfered with the relationship; and (4) that the defendant's actions harmed her. Comey v. Hill, 387 Mass. 11,18 (1982). A supervisor may be personally liable if she tortiously interferes with a subordinate's employment relationship, Steranko v. Inforex, Inc., 5 Mass.App.Ct. 253, 272-274 (1977), but is entitled to a qualified privilege unless she can be shown to have acted with actual malice. Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 663-664.

However, "the elements underlying a claim for unlawful retaliation may be used to show malice when a tortious interference claim is brought against a supervisor in a loss-of-employment case." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 77 (1st Cir. 2001). Since plaintiff has presented sufficient facts to support her retaliation claim based in large part (if not exclusively) on Ahl's conduct, the question of liability on the interference count is properly left to a jury. See Packard v. Mass., No.

08–11782–GAO, 2011 WL 4549199, at *13 (D. Mass. 2011); Booker v. Massachusetts Dept. of Pub. Health, 527 F.Supp.2d 216, 229 (D. Mass. 2007).

### C. Motion to Strike Unauthenticated Documents and Statements

Defendants move to strike two categories of exhibits attached to plaintiff's F.R.C.P 56.1 Statement in opposing summary judgment that defendants allege plaintiff failed to authenticate and/or improperly altered in some way.

The first category of documents (Exs. 12, 33, 34, 35 to P's 56.1 Statement) consist of partially redacted documents which, although produced in discovery, have not otherwise been authenticated. The second category of documents (Exs. 8, 17-18, 22, 41 and 43-56 to P's 56.1 Statement) consist of handwritten notes that plaintiff attributes to Ahl but that defendants' contend have not been so established in the record.

In response, plaintiff submits unredacted copies of the challenged documents and supplies an affidavit authenticating emails that were either sent to or by plaintiff in the first category of documents. The affidavit also attests to the fact that plaintiff has had the opportunity and ability to view Ahl's handwriting during the time in which Ahl supervised her and that she recognizes the handwriting on 16 of the category two documents as Ahl's. Fed.R.Evid. 901(b) (handwriting may be authenticated through a lay witness "based on a familiarity with it that was not acquired for the current litigation."); Noyes v. Noyes, 224 Mass. 125, 131 (1916) ("anybody familiar with a person's handwriting" may authenticate). The remaining exhibits were authenticated during Ahl's deposition testimony as being written by Ahl.

The court has discretion to allow a party to cure deficiencies with authenticity in supporting documentation. <u>McMahon v. Digital Equip. Corp.</u>, 162 F.3d 28, 34 n.6 (1st Cir. 1998) (supplemental affidavits in response to motion to strike cured initial failure to authenticate documents); <u>Goguen ex rel. Estate of Goguen v. Textron, Inc.</u>, 234 F.R.D. 13, 17 (D. Mass. 2006). In the exercise of its discretion, the court will accept the supplementation here. To the extent that defendant now argues that Ahl did not record these notations or that they refer to a different unnamed "Christine," such disputes are ones of material fact further supporting denial of summary judgment.

**IV. Conclusion**

Defendants' Motion for Summary Judgment (Docket # 17) is DENIED. Defendants' Motion to Strike Certain Documents and Statements Relied Upon by Plaintiff in Connection with Her Opposition to Defendants' Motion for Summary Judgment (Docket # 30) is DENIED.

|  |  |
|---|---|
| August 21, 2012 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |